# NETTIE ROSENSTOCK *v.* SAMUEL H. ROSENSTOCK.

*Partnership Accounting—Speculation in Stocks—Partner Furnishing Collateral—Bankruptcy of Brokers.*

Where members of a firm carried an account in the name of the junior member with a stock brokerage house, for the purchase and sale of stocks on margin, and after the death of one of the others the junior member pledged his own private resources to prevent the closing out of the account on a declining market, he was entitled to be reimbursed to the extent of his private funds thus used, before the estate of the deceased member of the firm could share in the amount so saved by him.

pp. 259, 260

The fact that the account with the brokers subsequently showed a large credit balance in excess of the amount of the junior partner's resources used for the benefit of the account, did not impose on him the duty of accounting to the deceased partner's estate for a share of such excess, although but a small part of the nominal credit balance was realized owing to the insolvency of the brokerage house.          p. 260

Since the junior partner did not make any further purchases of stocks or bonds for the account after his partner's death, he did not assume any risk, as having continued the business.

p. 260

In failing to liquidate the account at the time of his partner's death, which could have been done only at a disastrous loss, the junior partner did not unduly delay a settlement of the partnership account, and he was not liable by reason of the subsequent failure of the brokers, who had been selected by all the partners, and whose failure he could not reasonably anticipate.

p. 261

Such junior partner, who was the executor of the deceased partner, having managed the account after the latter's death without the sanction or authority of any court, he must bear

his individual loss resulting from the insufficiency of the dividends from the bankrupt estate of the brokerage house to cover his pledges of his own private resources.                    p. 262

On an issue as to the extent of the respective interests of three persons in a brokerage account, the declaration of one of them, since deceased, that he and his brother had each an interest of one-tenth only, and not, as was claimed by the brother's widow, a one-third interest, was admissible in a suit by such widow against the last surviving partner, as being against the declarant's interest.                    p. 264

*Decided June 29th, 1926.*

Appeal from the Circuit Court for Frederick County, In Equity · (URNER, C. J., WORTHINGTON and PETER, JJ.).

Bill by Nettie Rosenstock against Samuel H. Rosenstock for discovery and accounting. From the decree rendered, plaintiff appeals. Affirmed.

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Leo Weinberg,* with whom was *Benjamin B. Rosenstock* on the brief, for the appellant.

*H. Kieffer DeLauter* and *John S. Newman,* with whom was *Parsons Newman* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The appellant, Nettie Rosenstock, is the widow of Jacob Rosenstock, and the appellee, Samuel H. Rosenstock, is his nephew, and all were residents of Frederick, when Jacob Rosenstock died on December 9th, 1920. The testator, after minor bequests, gave all the residue of his estate to the appellant for her life, and then over to his children in equal shares. The will conferred upon the appellant full power of disposition and investment of the estate, in her

discretion, and of advancements to the children for their education, welfare or maintenance. The testator provided that if the appellant should decide to sell his interest in the firm of Rosenstock Bros., clothiers, or the Gem Steam Laundry, or the Frederick City Packing Company, or in the farms which were owned by him and his brother, Aaron Rosenstock, or "in any other enterprise or undertaking in which" he might be associated with his brother, or his nephew, Samuel H. Rosenstock, who is the appellee, or his partner, Moses Fisher, the appellant should give the option to purchase to these associates before offering the interest to any third person; and that the appellant "as far as can be consistently and properly done" should preserve his interest in these enterprises and undertakings for the benefit of his estate.

The appellant was named as the executrix in this will of February 15th, 1919, which, on the following May 1st, was modified to the extent of appointing the appellee a co-executor and, for the first time, relieving the executors of giving bond. The appellant and appellee qualified as executors and settled what was called a first and final account on February 20th, 1922. The amount of the estate accounted for was one hundred and thirty-five thousand, seven hundred and sixty-six dollars and forty-five cents and after a deduction of all credits, the executors declining all commissions, the entire residue of one hundred and fifteen thousand, two hundred and seventy-nine dollars and twenty-eight cents was distributed by the account to the appellant as life tenant, subject to the terms of the will. In this distribution to the life tenant was an item of five thousand and two hundred dollars, which was the estimate then given by the executors of the value of certain assets of the estate that, for the purpose of convenience, were grouped and carried in the account under the designation of "Speculative Accounts, various brokers, estimated $5200."

A few days more than two years and eight months after this administration account was stated, the appellant filed

her bill of complaint against the appellee for a discovery and accounting in respect to the speculative accounts of the testator, his brother, Aaron Rosenstock, and the appellee. After issue, the parties took their testimony in open court, before a full bench, and, after a careful and exhaustive examination and consideration of the voluminous record, the lower court adjudged that the appellee, on a just and proper accounting, was indebted to the appellant as life tenant in the sum of twenty-one thousand, two hundred and nine dollars and forty-six cents, on account of principal ($20,280.98), and interest ($928.48) for assets of the estate remaining in his hands and embraced in the item in the account carried as "Speculative Accounts, various brokers (estimated) $5200."

The appeal does not challenge the mathematics of the decree, but the determination of the lower court with respect to the share of the appellee in the several partnership relations among the appellee, the testator, and Aaron Rosenstock. A painstaking scrutiny of the complicated accounts does not uncover any calculation of the lower court which requires correction, and so we shall address our attention to the substantial questions involved, which will require a brief statement of how the various business undertakings of the appellant, Jacob Rosenstock, and Aaron Rosenstock, assumed their ultimate definite form.

Jacob Rosenstock and Aaron Rosenstock were brothers and together were the owners of all of the stock of the Frederick City Packing Company, a corporation engaged in business at Frederick, when the appellee, Samuel H. Rosenstock, their nephew and then but nineteen years of age, was employed by the company as its general manager. After several years the appellee had an opportunity to form a connection with a financial institution in New York, but he abandoned this opportunity when his two uncles gave him sixty-six and two-thirds shares of stock, or a one-third interest, in the packing company, whose total capital stock had a par value of twenty thousand dollars. At the time

of this gift, the two uncles were experienced business men, with other important affairs, and the appellee a young man of twenty-one years; and Jacob Rosenstock was made the president of the packing company and Aaron Rosenstock its secretary and treasurer, both serving without salary, and Samuel H. Rosenstock its vice-president and general manager at a yearly salary of thirty-five hundred dollars. The management of the company was conducted under the supervision and control of the three stockholders, who were familiar with its corporate business, although the appellee was the one who was entrusted with its securities and principally attended to the details of the enterprise, subject to the approval and the co-operation of his uncles. The corporation prospered and the salary of the appellee was increased to ten thousand dollars but, for a long period, no dividends were declared. However, withdrawals of parts of the profits were made for investment for speculative purposes; and other profits were invested in securities to be used for credit accommodations in the packing business. This course was the result of a considered policy of the three stockholders of the company, and these transactions were, by common consent, carried on in the name of Samuel H. Rosenstock, but as a result of the concurrent judgment of the uncles and the nephew, and subject to their joint control. There is no dispute that a portion of these undivided profits of the business was invested in stocks and bonds in an account carried in the name of Samuel H. Rosenstock with Stein Brothers, bankers and brokers of Baltimore, with whom the securities bought were left or kept there in a safe deposit box in the name of the nephew, with the right of access by one of the members of the banking house; and that another portion of the undivided profits was similarly invested and carried, although on marginal buying for speculative purposes, with Smith, Andrews & Marston, bankers and brokers of Baltimore. Nor is there any question that the interest in these two accounts was one of absolute equality among the three partners.

1. With respect to the account with Stein Brothers, later Stein Brothers & Boyce, the chancery court held this was not a speculative account, and, therefore, under the allegations of the bill of complaint, not within the scope of any relief sought. No ground has been disclosed to affect this conclusion. The company has kept accurate books since January, 1918, and these show what profits have been made since that time and how they have been divided, and nothing was disclosed by the proof sufficient to charge the appellee with any of such later profits. And, furthermore, the three shareholders had a settlement on June 24th, 1918, and the balance of the account with this particular banking house was shown by appellant's expert accountant to have been substantially in agreement with the amount set forth in the settlement. This agreement established that the appellee owed the appellant nothing up to its date out of this account.

The securities mentioned in this settlement on June 24th, 1918, were subsequently divided among the three shareholders, with the exception of one hundred and seventy-five shares of United Railway Investment preferred stock, ten shares of common stock of the United Drug Company, five shares of second preferred stock of the United Drug Company, and one thousand shares of stock of Mother Lode Copper Mine Company, one hundred shares of common stock of Houston Oil, and fifty shares of Simms Petroleum stock. It was agreed among them that these named shares should not be divided in kind at the time on account of their speculative nature and their uncertain value, but there is no reason why this should not be done and each interest receive its equal one-third share.

2. The account with the firm of Smith, Andrews & Marston was speculative, as it was for the purchase and sale of stocks and bonds on margin. Before the death of Jacob Rosenstock in December, 1920, a continuing decline in value of the securities carried by this brokerage house in the name of Samuel H. Rosenstock had compelled the pledging by the three equal shareholders of additional collateral to protect their account. Before the death of Jacob Rosenstock, they

had pledged as additional collateral over seventy-five thousand dollars in securities. If this account had been closed out by the appellee and Aaron Rosenstock upon the death of Jacob Rosenstock on December 9th, 1920, not only all the securities which had been purchased on margin, but also the additional collateral which had been pledged, would have been lost, and an indebtedness established. To prevent this financial calamity, the account was not closed out by the survivors, but, in order to protect the account, the appellee met the further calls for additional security on a continuing unfavorable market in 1921 by pledging more than twenty-five thousand dollars of collateral which was his own private property. After Jacob Rosenstock's death no collateral belonging to his estate, or in which his estate had any interest, was pledged, but the result of this policy was to protect the estate from loss, as when Smith, Andrews & Marston went into bankruptcy on December 9th, 1921, the account, as of November 1st, 1921, showed the bankrupts to have been indebted to the appellee, in whose name the account was carried, in the sum of three hundred and two thousand seven hundred and fifty-eight dollars and fifty-six cents on account of securities held by said bankrupts, and the appellee to have been indebted to the bankrupts on this account in the sum of two hundred and sixteen thousand nine hundred and thirty-six dollars and six cents, which left a clear indebtedness of the bankrupts to the appellee of eighty-five thousand eight hundred and twenty-two dollars and fifty cents.

On this record, it is plain that the appellee pledged upwards of fifty-seven thousand dollars of his own private resources to protect the account, and he received about twenty-six thousand dollars in dividends from the bankrupt estate of Smith, Andrews & Marston, which left him with a personal loss of about thirty-one thousand dollars. The action of the appellee in thus protecting the account did not imperil any of the estate of his dead associate, but prevented the estate from sharing in the heavy loss which would have resulted from a closing out of the account on the death of Jacob Rosenstock. Under the unusual circumstances of this particular

case, we know of no principle of equity which would permit a dead partner's estate, which has been protected from loss by the use of the personal property of a surviving partner, to share in the amount thereby saved, before the surviving partner is reimbursed to the extent of the employment in this service of his own private funds. *Matthews v. Adams,* 84 Md. 143. This the appellant conceded, but insisted that, inasmuch as the account with Smith, Andrews & Marston showed a book credit to the appellee of eighty-five thousand three hundred and fifty-three dollars and eleven cents, on a valuation of the undelivered securities as of November 1st, 1921, the appellee must account for the difference between this credit and fifty-seven thousand dollars, which was the value of his pledged securities, and account for the one-third of this difference, or nine thousand one hundred and seventy-one dollars and four cents, to the appellant. The arbitrary nature of this demand is disclosed by the selected date, November 1st, 1921, when on December 9th, 1921, the brokers were bankrupt and the total claim was worth but about twenty-six thousand dollars. The appellee is asked to bear not only his personal loss of thirty-one thousand dollars in securities, but also the sum of eighteen thousand three hundred and thirty-four dollars and eight cents of paper profits which were never realized.

The law gives to the surviving partner a reasonable time within which to wind up the partnership affairs. What the length of that period may be must vary according to the object of the joint undertaking, as well as the circumstances of the partnership affairs, and the nature of the social assets and liabilities both at and following the time of the death of the partner. It does not appear that the appellee made any further purchases of stocks or bonds for this account after the death of appellant's husband. As the appellee did not carry on the trading by fresh undertakings, so he cannot be said to have assumed the risk of continuing the business. In fact, he apparently accepted his duty and problem to be that of liquidation, without avoidable loss, since the intrinsic nature of the transaction between the brokerage house and

the appellee as the agent of the three partners in the transaction was that of debtor and creditor, with the bought bonds and stocks pledged as collateral to the creditor for its protection for the debt. The debtor, if able, could pay the whole indebtedness and receive from the creditor and broker the securities bought and pledged, but if the debtor failed to pay or to maintain the margin exacted, the creditor could close the account by a sale of the collateral, and hold the debtor for any difference between the amount of the debt and the proceeds of sale of the securities, if these were worth less on the market than the amount of the debt. The narrow margin in this particular transaction between the debt and the collateral pledged, and the large amount of indebtedness, made the position of both creditor and debtor precarious, and the safety of the latter was dependent on his ability to pledge additional security as the value of the original pledged securities receded on the market.

The judgment of the appellee was that haste in liquidation would be disastrous, and that delay would be met by a rise in the price of the pledged securities, so, not having available the capital to buy, he prevented enforcement by the brokers of the contracts of purchase, and a consequent disastrous loss, by pledging his own property. By this action he secured the desired delay, and the eventual change of the appellee's position from a debtor to a creditor of the brokers was due to this policy, which was favored by the anticipated recovery in value of the securities pledged. In pursuing this plan, the appellee certainly was not unduly delaying a settlement of the partnership account, and his judgment would have resulted in a gain for all interested, if it had not been for the unforeseen failure of the brokerage house. For this unexpected bankruptcy, the appellee can not be held at fault, since the brokers had been selected by the three associates in this trading venture, and the indebtedness and liability of the three existed at the death of Jacob Rosenstock, and there is nothing in the record to indicate that the failure should reasonably have been anticipated by the appellee. So, the choice of brokers, the nature of the joint enterprise, and

indebtedness at the death of one of the adventurers, were as much the act of the appellant's testator as that of the appellee, who made no profit out of the delay, except the common profit of all three in lessening the indebtedness and loss as it existed if it had been taken at the death of testator. The action of the appellant, who was not only a surviving partner but the executor of Jacob Rosenstock, was consonant with the authority conferred upon the executors of the will, but the appellee acted upon his own responsibility in jeopardizing his own property. He lessened the original loss to the estate of his uncle, and the failure to realize an apparent profit was without his legal default, so he can be held responsible for neither loss nor gain. But in his management of the enterprise, after the death of his uncle, he did not seek nor obtain the sanction or authorization of any court, and he must bear his individual loss of thirty-one thousand dollars as the penalty of his voluntary hazard.

3. There remains for consideration the speculative account with Newburger, Henderson & Loeb, who are bankers and brokers at New York. The difficulty with this account springs from the disagreement of the parties as to the share of the appellant's husband. It is not controverted that the two uncles were partners in this investment account, but this appeal assigns as error, the conclusion of the court of chancery that Jacob Rosenstock and Aaron Rosenstock each held an equal one-tenth share, while the appellee had the remaining eight-tenths. The appellant would enlarge this interest to a one-third equal part. If there had been no express understanding, nor other controlling evidence and circumstances, the general rule of the common law that partners share equally in the profits and losses of the joint undertaking would prevail, but here the only direct evidence on the subject is clear and explicit that the partners had expressly agreed that in the account carried with Newburger, Henderson & Loeb the two uncles should each have a one-tenth share, and the nephew the remaining eight-tenths.

The appellant framed her bill of complaint upon the theory

of equal proprietorship, but the answer of the nephew, which was verified by his oath, denied this relation and averred that each uncle had but a one-tenth part. Notwithstanding this positive statement of the answer, the appellee was called as the appellant's first witness. He was subjected to a severe and searching examination as a hostile witness; and, while minor inconsistencies and discrepancies are naturally found in his testimony, which covered a long period and involved numerous financial transactions and business relations, yet this court is impressed by its inherent verity and accuracy with respect to the matters in controversy. The natural assumption that the same equality would prevail in the New York transaction as in the other distinct business associations of the parties yields to the unforced and convincing description by the appellee of the origin and development of this particular partnership. The appellee first opened an individual account with these brokers, and later his uncles suggested that they be allowed to participate on the basis of a one-tenth interest each. The agreement was not in writing, but it was established by the positive and circumstantial testimony of the appellee, when testifying at the call of the appellant. His direct evidence is supported by the corroborative circumstance that the several contributions to the capital employed in this transaction by the partners were in significant approximation to their respective proportional interests. The most impressive support of the appellee's testimony is supplied by his uncle, Aaron Rosenstock, whose pecuniary interest in establishing a greater share than one-tenth was the same as that of his brother's estate. Aaron Rosenstock died before any testimony was taken, but a copy of the bill of complaint had been submitted to him, and he then declared to Moses Fisher, an old friend and business intimate, that the New York account "was mostly Sam's," and that the interest in it of his brother and himself was small. It is further a weighty circumstance that the appellee was assisted by his uncle Aaron in the preparation of his answer, which was a detailed denial of the charges preferred

by the bill of complaint, and a full presentation of the appellee's defence. The appellant has invoked familiar presumptions made against those occupying a fiduciary position, when called upon to account, but these presumptions are simply aids and guides in reaching a conclusion, and do not nullify or outweigh direct, positive and credible testimony, which is corroborated not only in the manner specifically shown, but by numerous minor facts and circumstances whose correspondence with the testimony of the appellee would not occur except by reason of its fundamental accuracy. It will serve no useful purpose to point out these facts and circumstances, as to do so would carry this opinion to an unwarranted length. Our conclusion on the record is that the share of the appellant's testator in the New York account was one-tenth and not one-third; and that the total amount due the appellant as life tenant in the account with Newburger, Henderson & Loeb was correctly ascertained by the decree of the chancery court.

4. The court was right in refusing to strike out the evidence of the declarations made by Aaron Rosenstock, as they were statements of evidential facts clearly against the interest of the declarant.

For the reasons given the decree appealed from will be affirmed, as we understand it does not affect any right of the appellant to a one-third undivided interest in the undistributed shares of stock of the six companies held by the appellee, but embraced in the agreement of June 24th, 1918.

*Decree affirmed, with costs.*